# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

NO. 03-23-00184-CV
NO. 03-23-00191-CV

---

**M.E. and D.R., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 274TH DISTRICT COURT OF COMAL COUNTY**
**NO. C2022-0420C, THE HONORABLE MELISSA MCCLENAHAN, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

In these two related appeals,[1] M.E. (Mother) and D.R. (Father) appeal from the trial court's orders terminating Mother's parental rights to three of her children—Kevin, Laura, and Mary (the "Children")—and Father's parental rights as to Laura and Mary (the "Daughters").[2] Mother challenges the legal and factual sufficiency of the evidence supporting the best interest finding as to the termination of her parental rights. *See* Tex. Fam. Code § 161.001(b)(2) (best interest). Father challenges the legal and factual sufficiency of the evidence supporting the predicate statutory grounds for termination. *See id.* § 161.001(b)(1)(D) (endangering environment), (E) (endangering conduct), (N) (constructive abandonment),

---

[1] Mother filed notices in both appeals; Father only filed a notice of appeal in cause number 03-23-00191-CV.

[2] For their privacy, we will refer to the children by aliases and to their family members by their relationships to them or by aliases. *See* Tex. R. App. P. 9.8.

(O) (failure to comply with court order). Father also challenges the legal and factual sufficiency of the evidence supporting the best interest finding and the conservatorship appointment. For the following reasons, we affirm the trial court's termination orders.

## BACKGROUND

Mother is the biological mother of Kevin, Laura, and Mary, who were ten, five, and three, respectively, at the time of the bench trial. Father is the biological father of Laura and Mary. Mother's children had been removed at least three previous times, with the most recent removal occurring in 2017 or 2018. On January 24, 2022, the Department received an intake alleging neglectful supervision of the children by Mother. During a traffic stop, methamphetamine and related paraphernalia were discovered in Mother's car, although Mother reported that the drugs belonged to Megan, her oldest daughter who was of the age of the majority at the time of the final orders. Father, who did not live with Mother at the time, told the Department's investigator that Mother called him from jail and said she had been arrested leaving a "trap house."[3] Mother initially tested positive for amphetamines on a February 1, 2022 uranalysis test. The Department filed a petition seeking temporary orders to require Mother to participate in services, but after Mother tested positive for methamphetamines on a hair-follicle drug test on March 31, 2022, the Department sought removal of all three children. All three children subsequently tested positive for amphetamine, with Laura and Mary also testing positive for methamphetamine, on April 4, 2022. Kevin was placed with his maternal grandmother for the remainder of the case. Laura and Mary were placed with Father from April 12 through

---

[3] A "trap house" is a residence used for selling narcotics. *United States v. Johnson*, 14 F.4th 342, 345 (5th Cir. 2021).

2

June 23, 2022, but they were subsequently removed and placed into a foster placement for the remainder of the case.

***Mother's Bench Trial***

A one-day bench trial as to Mother's parental rights was held on January 12, 2023, at which Foster Mother; Sara Cardwell, the Department family-based safety services (FBSS) caseworker; Cecilia Ramirez, Department investigator; Leslie Whiteley, permanency specialist; and Mother testified.

Foster Mother testified that Laura and Mary were placed in her home on June 23, 2022 and that the Daughters are now "doing well" and "very bonded to each other." When they first arrived, she described them as scared and explained that Laura "was very parental towards her younger sister." She testified that Laura originally wore pull ups, "defecat[ed] on herself hourly," and suffered from encopresis, which she described as "chronic constipation," and enuresis.[4] Laura also cried from pain when she ate. According to Foster Mother's testimony, since their placement Laura has been receiving treatment for her medical diagnoses and although "[s]he still has trouble with encopresis and enuresis daily, []that has improved dramatically." Foster Mother stated Laura now wears underwear but still has some accidents. Foster Mother also took Laura to multiple dental visits to resolve her dental issues, and she explained that Laura is no longer underweight, no longer cries when she eats, and "eats freely and loves" food. Foster Mother also testified that Mary was not potty trained initially, but that Mary is now fully potty

---

[4] "Encopresis is fecal incontinence and enuresis is urinary incontinence." *In re A.P.*, 184 S.W.3d 410, 413 (Tex. App.—Dallas 2006, no pet.); *see also In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *19 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.) (describing "encopresis" as involving child being "unable to control [their] bowel movements" and defecating on themselves).

3

trained. Foster Mother testified that the girls "trust me and definitely are responding as kids that feel safe and happy." She clarified that she is not a foster-to-adopt placement, but she "would continue to look after them and of course advocate for whatever is best for them" and would be willing to be a long-term foster placement.

On cross-examination, Foster Mother stated that the children "miss their family," but that Mary has spoken about staying with the foster placement (or having her parents live with her at the foster placement). When asked about the Daughters' attachment when initially placed, Foster Mother testified that Mary called Laura "mommy" and that Laura acted maternal towards Mary. She also testified that Mother attended several visits with Daughters, but also cancelled and missed many visits; she later clarified that Mother had attended at least two visits with Daughters, but then Mother stopped attending visits. She also testified that Daughters had several visitations with their brother Kevin and that the children enjoyed the visits.

Sara Cardwell, the Department FBSS caseworker, then testified that the Department had concerns about Mother's "drug use, methamphetamines specifically." Cardwell testified that Mother initially told her that she was not abusing methamphetamine and instead "her friend offered to give her gas money if she would go and pick up the friend and transport them to the house where the meth was located at so [the friend] could buy the meth." Cardwell testified that Mother told her "she was sober" and that "[h]er issue was alcohol," and that "she was really adamant that she was not abusing drugs." She also relayed that Mother described her behavioral changes after the previous removal case, including that she was sober, working full time, and she completed her "accountability court."

Cardwell testified that Mother tested positive for amphetamines on a urinalysis drug test on February 1, 2022. The Department was unable to get a valid test from a subsequent

hair-follicle specimen collected on February 8, 2022; Mother thereafter declined to take another hair-follicle drug test multiple times. During this time, Mother continued to deny she was using any drugs outside of her prescription medication for Vyvanse.[5] Mother ultimately agreed to take a hair-follicle drug test on March 18, which showed positive for amphetamine and methamphetamine. Mother thereafter told Cardwell that she had been unable to get her prescription for Vyvanse the previous month, that she had resorted to buying her medication "from off the street," and that Mother's friend told Mother that her "Vyvanse was being filled with meth." Cardwell testified that Mother told her that "she didn't realize it was meth because the only difference between meth and Vyvanse is it keeps you awake." Cardwell testified that buying prescription medication "off the street" was still illegal and that the Department was "already involved because she had [been] pulled over with meth in her car."

Cardwell confirmed that the children were living with Mother at this point in the case, but the Department sought removal of the Children on March 31, 2022. The Children were sent for drug testing, and on April 4, 2022, a hair-follicle drug test for Kevin was positive for amphetamine and similar drug tests for Laura and Mary were positive for methamphetamine and amphetamines. When confronted with the children's drug test results, Mother told Cardwell that "she believes it was her boyfriend because her boyfriend would do meth in the house."

Cecilia Ramirez, the Department investigator, reiterated that the Department became involved based on a report of neglectful supervision by Mother and that Father had told her that Mother "had called from jail and that she had been arrested leaving a trap house." She relayed that Father did not know if Mother was using methamphetamines but that "he wouldn't

---

[5] Vyvanse is a prescription medication used for treating attention-deficit/hyperactivity disorder (ADHD) in adults. *See, e.g.*, *In re N.T.*, 474 S.W.3d 465, 471 (Tex. App.—Dallas 2015, no pet.).

be surprised by it if she was." Ramirez then testified that Mother told her that a friend "was paying her $50 to pick up methamphetamine for that friend."

Leslie Whiteley, the permanency specialist, then testified that the Department was concerned this was Mother's fourth Department case and that she and the children had tested positive for methamphetamines. Whiteley described the requirements under Mother's service plan, explaining that Mother only partially complied with the drug testing requirements; that Mother's contact with her was sporadic; and that Mother attended sixteen visitations with the Children, missed eight additional visits, and that Mother did not inform her she would be missing said visits. Whiteley also testified that Mother tested positive for amphetamines and methamphetamines on a September 7, 2022 drug test and that Mother responded that "it couldn't be true" because she "doesn't do drugs. She doesn't do meth." Whiteley later testified that when she asked Mother about the children's positive drug tests, Mother blamed "a person in her home that was working on a fence and this person was smoking methamphetamines around her children."

Whiteley testified that Kevin was placed with his maternal grandmother, was "doing good," and that Mother had last visited Kevin approximately three months earlier. She confirmed that the Daughters were placed in a foster home, and she testified that she had no concerns about the Daughter's safety and well-being and that they were bonding with Foster Mother. When asked for further explanation, she explained that the girls are "thriving" and that they have met milestones that "for [Laura] should have been met a while ago," including knowing how to write her name and addressing her bathroom issues. Whiteley testified that the Department continues to have concerns about Mother's drug usage and failure to follow through

on services and whether the children would be properly cared for if returned to Mother's care. She confirmed that the Department was seeking termination of Mother's parental rights.

On cross-examination, Whiteley testified that psychological testing on Laura recommended "therapy, play therapy, and I believe intellectual and cognitive assistance" and that an "early childhood intervention" was completed on Mary. When challenged on whether it was unusual that Laura did not know her numbers or letters well at four years old, Whiteley responded that "[i]t is unusual in my experience that a four year old cannot sing the ABC song."

Whiteley testified that Mother had initially informed her that Laura had "an enlarged colon due to the size of her poop," but that Father told her Laura's medical issues were caused by what Mother was feeding Laura because Father believed Laura was lactose intolerant. Whiteley testified that during this time, Laura was not being seen by a physician but was being treated with over-the-counter suppositories. Whiteley testified that Laura had difficulty eating and had not been to a dentist or physician about her eating issues prior to her placement with Foster Mother. When asked for further clarification, Whiteley testified that she did not have records of Laura's dental issues prior to when she was placed with Foster Mother, but that she had previous records of Laura being seen by a gastroenterologist "for stomach pooping/issues, but her treatment was never followed up on" and the medication "was not being provided to her." Whiteley testified that she had received Laura's medical records from the gastroenterologist but that she did not believe Laura had seen that medical provider since 2020. When asked how Laura is doing medically now, Whiteley responded that she is "doing phenomenal right now," although she still has some struggles.

Whiteley testified that Mother told her that she does not speak to Father but that she was living in a house that had been leased by Father because "he was helping her to get into

7

the home at the beginning of the case." She conceded that Mother's residence was nice and suitable for children, but she cautioned that the lease ends in a few months. Whiteley testified that Mother stated she would do "anything and everything to get her children back," but she then confirmed that Mother has failed to complete her services. Whiteley testified that Mother had not seen the children since October 2022.

Whiteley testified that Kevin had expressed that he "wants to see his mom." When asked about the desires of the girls, Whiteley testified that she could not speak as to Mary's desires because she is three years old; Laura "has not specifically said to me that she wants to live with her mom or her dad" but rather indicated she would like to see her older siblings. She testified that the children are well-settled in their current foster placement, that they are attending medical and dental appointments, and she recommended they remain in the current placement until a more permanent placement is established. She also testified that Kevin is currently placed with his maternal grandmother and that he is doing well in the placement. When asked about the Department's long-term goal for the Children, Whiteley responded that "[w]e are looking for a safe and stable home for them."

Mother then testified, stating she was aware Laura had been suffering from fecal incontinence and soiling herself. She explained that Laura had not been to the gastroenterologist since May 2020 and that the prescription was expired because it was taken "as needed" and Laura could not take it for a time because she had the flu. Mother denied that Laura is lactose intolerant, and she testified that she took Laura to the pediatrician "[w]henever she was ill." When asked why Laura had cavities because of her lack of nutrition, Mother explained that Laura refused to eat because of her "poop problem," so Mother would "give her whatever she wanted to eat." Mother testified that she was aware of Laura's cracked tooth, but that she "didn't

8

see that it was that bad at all," and she disputed that Laura "cried incessantly." Mother testified that the Children go to the dentist once a year, but she could not recall the exact date she last took them.

Mother testified that she was still employed and had a home suitable for the Children. Mother denied using methamphetamine, and when asked why she has not submitted herself for the last two drug tests, Mother explained that "[the Department] won't communicate with me and they won't communicate with my doctors. I don't understand why I'm supposed to communicate with them." Mother testified that she had not taken methamphetamine since the last time she took her Vyvanse. Mother later reiterated that she only had methamphetamine in her system from that prescription medication she bought on the street, that buying such medication was not prudent, and that she was no longer using it without a prescription. Mother confirmed that her children had been removed three times from her care. She also testified that she had been arrested on December 5, 2022, for driving without a license, no insurance, and having an open container and that she had not reported that arrest to Whiteley.

Mother testified that she missed her children "[m]ore than anything in the world." Discussing the children being returned to her, Mother explained that Kevin and Laura would be in school, and that Mary would go to daycare. She testified that she would not keep her job because she would need to "work days and not nights," and she also clarified that she had not picked a specific daycare for Mary but that "there's a bunch close." Mother conceded that she does not have a driver's license, and when asked how she would transport the children to appointments and other things, she stated she would "find a way." Mother explained that her current lease will end in a few months, but if the children were returned, she would sign another lease. Mother testified that her rent is approximately $2,000/month, that she currently makes

9

approximately $600/week from her work, and that she would be able to afford rent because she would receive child support if the children were returned.

Describing the person who she blamed for exposing her children to methamphetamine, Mother testified that she partnered with the man to build fences "just to make money and keep my home," that the man sometimes stayed with her and her children, and that he was the individual smoking "that stuff." She later clarified under cross-examination that she had been in a relationship with the man, but it was not "boyfriend/girlfriend," and testified that she kicked him out when she learned he was smoking methamphetamine in the house. She later admitted she continued to communicate with her former partner while he was incarcerated. Mother testified that her former partner must have been the cause of the Children's positive test results because "there's no one else smoking meth in the house."

Kerri Bechtel, the CASA volunteer for Laura and Mary, recommended that the children not be returned to Mother because she is "unfit at this point," "has no clue what's going on," and "has not participated in her services." Bechtel also expressed concern about Mother's "lack of accountability" and her continued blaming of "the Department and CASA for all of this." Shea Schmidt, the CASA volunteer for Kevin, also recommended that Mother's parental rights be terminated based on the testimony, Mother's recent arrest and missed visits, and lack of "a clean hair-follicle" drug test.

At the end of the hearing, the trial court admonished that "I don't find [Mother's] testimony likely to be truthful at all." The trial court then terminated Mother's parental rights as to all three Children (Kevin, Laura, and Mary) pursuant to subsection (D), (E), (O), and (P) statutory grounds and found that termination was in the Children's best interest. *See* Tex. Fam. Code § 161.001(1)(D), (E), (O), (P), (2). Mother then appealed.

10

*Father's Jury Trial*

On March 13, 2023, a jury trial then began on termination of Father's parental rights as to Laura and Mary.[6] During the four-day trial, the jury heard testimony from Ramirez; Cardwell; Father; Whiteley; Elizabeth Greenhill, the director of the Daughters' daycare; Foster Mother; Bechtel; Daughters' Cousin; Pete Ruth, Father's friend; Daughters' Aunt; and Daughters' Paternal Grandmother.

Cecilia Ramirez, the Department's investigator, returned to the stand, describing how the initial referral concerned allegations of neglectful supervision by Mother after she was pulled over for possession of methamphetamine and drug paraphernalia. Ramirez testified that Father soon thereafter contacted her, told her that Mother "had called him from jail and she told him that she had gotten pulled over leaving a trap house," and that he wanted his children. Ramirez testified that the Daughters were initially placed in the home of Father's parents in late January 2022, pending the results of Father's initial drug test, which was negative. As she later clarified, the Daughters were "placed with their dad, but legally on paper, the grandparents were in charge." She testified that the children appeared to eat with him and that he "seemed to know what he was doing" with the children. She also clarified that Father was not part of the initial referral and that he was not the target of the initial investigation. Ramirez noted, however, that Father had a "blower" on his vehicle relating to a previous conviction for driving while intoxicated (DWI). Ramirez testified that her investigation concluded when the matter was referred to FBSS.

---

[6] As for Kevin, the other parties signed a mediated settlement agreement appointing Kevin's father (not Father involved in this appeal) and the maternal grandmother as joint managing conservators after the termination of Mother's parental rights. The action concerning Laura and Mary, the biological children of Father, was severed into a separate cause number.

11

Cardwell, the Department FBSS caseworker, then testified that the matter only remained with FBSS for a "short time" because of Mother's and Daughters' subsequent positive drug test results. Cardwell explained that the Daughters were returned to Mother at some point between February and April 2022, but after the drug test results, the Department sought removal and the Daughters were placed with Father on April 12, 2022. Cardwell testified that at the time she did a home visit at Father's residence and found he was an appropriate placement.

Father testified that he owns his home and has four children, two older children from a previous marriage (not subject to the present proceeding) and the Daughters. Father acknowledged he was the biological father of the Daughters, that he and Mother began their relationship in 2015 and that they had "split up probably about five or six or seven times over the course of our relationship." He testified that he lived with Mother in 2016 when the Department became involved because Mother had been drinking while pregnant with Laura, but he disputed that he knew Mother was drinking at the time because he "had a full-time job" and she "would hide her alcohol." Father also confirmed that Laura was removed from his care in February 2017 after she was born but she was then returned after he completed services. Father testified that he stopped living with Mother "sometime in 2019."

Father testified that alcohol "was her problem" and denied having knowledge that Mother had a drug problem. When asked why he told the Department he was not "surprised" that Mother had been arrested for drugs, Father testified that it "wasn't surprising because she got arrested for it. I had no idea what she was doing." Father testified that he "did not struggle with alcohol," but then later admitted that he had been convicted of DWI on four occasions (including DWIs in December 2019, March 2021, and April 2021), that he had an ignition interlock device installed on his vehicle as part of his probation, and that he would go to jail for

12

up to one year if he violated his probation. Father, however, explained that "it was never when I was in possession of my children" and "never with my children." Father later testified that he had not had alcohol in almost two years, had been clean his whole probation, and that no motion to revoke his probation had been filed.

Father testified that, because he was the non-offending parent in the present case, he believed he should not "have to work any services" beyond "the initial proving that I wasn't doing any drugs or alcohol." Father thereafter testified that he "would absolutely do anything for my children" but confirmed that he refused to work any type of services. Father testified he agreed to a temporary managing conservatorship with the Department "under duress." Father acknowledged that he knew services would be required at the time he agreed to the conservatorship, and he confirmed he refused to do any services and refused to cooperate on the service plan.

Father explained that the girls were in his care from April 12 through June 23, 2022, and he did not recall why the children were placed back with Mother between January and April 2022. Describing his living situation, Father testified that his home was next to a playground, that he had previous cooking experience owning multiple food businesses and that the allegations he let his children "starve" was "ridiculous," and that Laura and Mary shared the bottom bunk of a bunk bed at his home (another of his children slept on the top bunk). Father testified that the Daughters had a strong relationship with his older two children. He also testified that he was in the process of potty training the Daughters when they were removed.

Father conceded that he did not take either Laura or Mary to the medical evaluation within thirty days as required as part of their placement with him. Father clarified that he did take Mary to the emergency room for treatment of conjunctivitis. When asked about

his failure to comply with the requirement to take the girls to the required medical evaluations, Father explained that he was not given "the insurance information so I can make the actual appointments to get them to the doctor." When asked whether "nothing you have failed to do is your fault, but it's the Department's fault," Father responded, "Absolutely."

Describing the Daughters' medical issues, Father testified that Mary contracted conjunctivitis at daycare and had to get medication from the doctor; Father disputed, however, that the treatment did not resolve the conjunctivitis, arguing that instead Mary contracted it a second time. Father testified that Laura was "overly constipated from eating too many dairy products that was causing her to have a prolapsed anus" that made it difficult for her to have normal bowel movements. Father testified that he had notified the daycare about Laura's dietary restrictions and that he would pack a lunch for her when required, but he disputed that he told the daycare or the Department that Laura was lactose intolerant. When asked how he was treating Laura, Father testified that he was not giving her medication, that he was giving her "a healthy diet with less cheese and less dairy," and that the treatment was based on medical advice he received from a previous medical appointment. Father disputed that he administered suppositories to Laura as part of her treatment, stating that Mother gave her suppositories.

Father confirmed that neither Laura nor Mary had seen a dentist, that he failed to take the Daughters to the dentist as required as part of the placement, and that he "was not aware of any dental issues that they had." Later during cross-examination, Father reiterated that he did not know about Laura's six cavities, chipped tooth, or that a back molar was "black." He also testified that Laura was "not continuously crying in my care" when eating.

Father confirmed that Laura and Mary were removed on June 23, 2022, due to concerns about the health and safety of the girls and his lack of cooperation with the Department.

14

Father disputed allegations that Daughters were sent to daycare hungry, explaining that he "fed [his] children." Father also reiterated that he did not take the children for their medication evaluations because he contended the Department took "over a month and a half to get me the insurance information," that he had set a medical appointment for the "day after [the Department] took them," and that the Department did not ask him about the appointment before removing the girls or remind him about other assessments required as part of the placement. When later questioned about the insurance information contained in documents Father received on April 12, 2022, and May 6, 2022, Father responded that he "was not aware that's what I was supposed to use" for scheduling the Daughter's medical evaluations.

Father agreed that he "got very aggressive" after the Department removed the children and that, for a time, his contact with the Department was required to go through text message or email. Father confirmed that testing was required under his service plan but that he had not completed alcohol testing except for at least two tests early in the process. Father complained that he worked in San Antonio and therefore it is "[e]xtremely" difficult to comply with testing requests from the Department because the testing is in New Braunfels. Father confirmed he never requested a weekend appointment for drug testing, and when asked why he did not request one, he responded that "I would think that that's something the Department should have thought about." Father testified that he had "no concerns" that he would test positive on any testing by the Department, but he confirmed that he has refused "for the last nine months, to do anything that the Department has asked" of him.

Father repeatedly testified that he had refused to work with the Department or do anything the Department asked of him and that he did not like the Department. He also confirmed he had not visited the Daughters in the nine months since they were removed and he

15

explained that he attempted to visit them "by getting in front of the Court." Father expressed that he wanted his parents to "facilitate the visit" with the Daughters but he refused to go through the visitation scheduling application required by the Court because the Department "is requiring me to pay to visit my children" and he refused to "pay the person who stole my children." Father confirmed that if he had worked his services, he would have been considered compliant, and then his children would have been returned. Father also testified that he knew visitation was important for children but that he has not done visitation. But when asked about his inability to put his differences with the Department aside in the interest of his children, Father responded that "[m]e not seeing my children through the Department is in the interest of my children, in my opinion." When asked about the children bonding with their caregiver, Father responded that "I would say the Department has successfully brainwashed my children and that they should be completely [to] blame for what they have done."

Whiteley, the permanency specialist, then returned to the stand and confirmed that the placement paperwork required Father to take Laura and Mary to a medical evaluation within thirty days and that she provided the information necessary to schedule the visits. Whiteley explained that the checkup was important in this case because both girls tested positive for methamphetamines and "we don't know what's happening to their little bodies." She testified that Father was also supposed to take the Daughters to a dentist visit within sixty days of placement. She testified that she showed the service plan to Father during a family group conference, but that father "told us all to fuck off and hung up." After Father passed his initial drug test, the required services under the service plan included additional alcohol testing. She clarified that Father completed several tests "in the very beginning when the girls were still placed with him," but that he otherwise did not comply with that requirement. She testified that

16

she asked Father to take approximately thirteen alcohol and/or drug tests, but that Father only completed approximately four tests, including his initial drug test.

Whiteley testified that the dentist visits are necessary to confirm "their needs are being met" and that Father failed to take the girls to the dentist. She testified that she requested Father take the girls to the dentist, that Father initially told her that "he would as soon as possible," but when "I clarified that as soon as possible meant within the next week," Father responded: "Fuck you." Whiteley testified that the medical placement paperwork also requires doctor's visits, that Father received the information necessary to schedule the doctor's visits, and that Father received by email signed copies of the documents the night the girls were placed with him. She resent the relevant documents again on May 6. She testified that Father failed to take the girls to the required medical evaluations, even though Father had also told the Department that Laura was suffering from "softball-sized poop"; she ultimately was not officially diagnosed with encopresis and enuresis until she was placed with Foster Mother. Whiteley testified that Father "discussed it with me that they did over-the-counter child suppositories." Whiteley testified that Laura was not potty trained "when she came into care" and that children her age are typically potty trained. When asked whether Laura knew how to change her own pull-up at four, Whiteley testified that Laura "never tried to do it for me," that Laura "did not tell me that she had a dirty diaper or a wet diaper or anything like that," and that Laura "would continue to play" if an adult did not notice it.

Whiteley explained that Mary contracted conjunctivitis, stating that she received antibiotic eyedrops and that Father "told me she was much better; she was a hundred percent improved" about five days later; however, Whiteley later had a face-to-face visit with Mary and she still had a red eye and was feverish. When Whiteley cautioned Father that "he was risking

17

placement of his girls if he didn't get them to their medical appointments," Father responded, "Fuck you. Take me to court."

Whiteley testified the Daughters were removed because of concerns about their medical needs and Father "was refusing to take them to any of the appointments and then he would get very aggressive and angry with me." She explained that she removed the girls from daycare because she was afraid of confronting Father in person, citing his aggression throughout the case, including "calling me names, telling me to fuck off"; she explained that Father had been ordered by the courts to only communicate with her through email and text messages. Whiteley testified that Father was able to take time off from work for his own personal medical appointments, but that he had not "gotten the time off" for the alcohol tests. She testified that Father would need to do his visitations with the girls through a paid service for supervising the visits so that she was not involved in any way, and that the reason for having to use the service was "[d]ue to the way he behaved with me and for my safety." She testified that Father has not had any in-person visits with the girls in approximately nine months.

Whiteley testified that Laura has started kindergarten while in the foster placement, can spell her name, does her homework, and is "doing phenomenal in school." She testified that Mary stays home with Foster Mother, can now spell her name and write it, and that she is now "very independent, which is not something that she was in the beginning when I first became the caseworker." She testified that Laura's medical needs have been addressed and she has improved since starting treatment; Laura now wears "big-girl panties" and is no longer in pull-ups (although she still has some accidents). Whiteley also noted that neither Laura nor Mary was potty trained when placed, but that both are now potty trained. She described the girls' typical demeanor now as "very happy to see me" and "just happy little girls." She testified

that if Father's rights were terminated, the Department has a potential adoption placement for the girls that would be a safe place for them and would love the girls. She expressed concern that Father "saw what was happening" to the Daughters but he "didn't do anything about it" and that his inaction endangered the children. When asked whether Father completed his service plan requirements, Whiteley responded: "Not at all," explaining that he has no-showed to multiple alcohol tests and has failed to communicate with the Department. Whiteley also testified to her belief that Father had abandoned the girls because "he hasn't even attempted to contact them. He's not in any way trying to show that he cares what's happening to them." She testified that she was asking for Father's parental rights to be terminated because Father "has not once shown that he can put forth the needs of his children over his own," that he's not shown concern regarding Laura's medical issues, and her concerns that "if he's not going to help [Laura], he's not going to help [Mary]."

On cross-examination, Whiteley clarified that she did not have any concerns of Father's home, which she described as "clean, well kept, and free of smells." When asked to clarify how Father was being aggressive in front of the children, Whiteley explained that Father would get "really agitated at me" in front of the children about the alcohol testing and she had to ask him to stop. She later expounded that Father was profane, loud, yelling, and "very irritated" during that conversation, which took place in the kids' bedroom. Whiteley also explained that they have made efforts to locate relative placements for the children, but that they "have not found anybody that is able to take them, that is willing to take them, or that would be approved to take them." She clarified that she reviewed the placement paperwork with Father the night the children were placed, that she emailed him copies of the paperwork the same night, and that she then re-sent the portions of the paperwork concerning the medical consenter on May 6 after

19

Father told her "that he didn't know what he needed to do." She further explained that the Medicaid information on the placement materials is sufficient for scheduling appointments.

Whiteley explained that she consented to Laura's dental procedures and that Laura received a diagnosis of her dental issues within three days of placement in foster care. Whiteley explained that prior to the dental procedure, Laura "was very uncomfortable" and did not like putting things in her mouth except for "soft foods." After the procedure, Laura now "eats everything" and "she didn't seem to be in pain anymore. She didn't cry. She doesn't flinch." Whiteley explained that Laura was underweight when she arrived at the foster placement, but she has since gained weight. She clarified that they had concerns about Father's alcoholism and previous Department cases, and that after caring for the girls they had additional concerns relating to the Daughters' "medical neglect, their nutrition[], and the concerns of his behavior in general." She also clarified that they did not believe Father caused the medical issues Laura was experiencing, but that Father failed to address those medical issues during the months that the girls were in his care. Whiteley testified that Father told her that Laura was lactose intolerant, but that she is unaware of any medical records confirming that diagnosis.

Elizabeth Greenhill, the director at the Daughters' daycare, then testified that both girls attended full time daycare, five days a week, for approximately two months. She testified that Father or the grandparents dropped the girls off and picked them up at the daycare. Greenhill confirmed that neither girl was potty trained. Greenhill later clarified that Laura's lack of potty training was "highly unusual for a child her age," but that Mary's lack of potty training was not unusual. Greenhill testified that Father told the daycare that Laura had a dairy allergy, that she suffered some bowel incontinence because of the allergy, and that neither girl had much dairy at home. She testified that Laura was still having incontinence issues even though she was

20

not receiving dairy and she recommended that Father "try to get a diagnosis and see what was wrong" and how to help Laura. Greenhill testified that the daycare provided a weekly menu to the parents of the lunch meals and that the parents have to provide alternative lunch meals (or portions of meals) for their children to eat on days when the daycare-provided meal contains dairy products. Greenhill testified that this policy was communicated to Father, but that Laura "brought lunch only a couple of times." She testified that the girls usually arrived soon after the daycare opened at 6:30 a.m., that she noticed that the girls "would come in hungry fairly frequently," which she described as "a few days out of the week," and she let the parents know and asked them to bring something for the girls to eat in the morning (or make sure they ate before coming in). Greenhill agreed that children sometimes complain of hunger when not actually hungry, but she testified that how often Laura and Mary were complaining about being hungry was a red flag to her. She also clarified that the daycare does not generally give the children candy or sweets.

Greenhill described the day Mary had conjunctivitis at school, stating Mary's eye was red in the morning and the symptoms got progressively worse until they requested Mary be picked up to go to the doctor. She testified that there were no other cases of conjunctivitis in Mary's class at the time. She testified that Mary was taken to a doctor, received medication, and was treated, and that her symptoms improved before they reoccurred and she had to be sent home again.

Foster Mother then testified that Laura and Mary were placed with her on June 23, 2022. She testified that both Daughters were in diapers when they were first placed with her, and she had concerns about Laura in diapers because she was almost five years old and she would not verbalize when she needed to be changed. Foster Mother testified that the girls

21

were underweight when they first were placed, and that Mary "seemed food challenged" in that she would go "straight for any food that was out." She testified that when she fed Laura the first day, she "would begin to eat, [and] she would cry," but Laura could not tell her why she was crying. Foster Mother testified that the first day Laura also had multiple soiled pull ups with "smearing" but none were a bowel movement, and after a bath she discovered Laura had a "prolapsed anus." She took Laura to a doctor's appointment and Laura was diagnosed with encopresis, which she described as her bowels not working correctly because of "chronic constipation." The prescribed treatment was "a pretty aggressive clean-out with medication" and Foster Mother testified it took seven days for Laura to have a "true bowel movement." Foster Mother testified that Laura's belly was distended initially, but returned to normal once she started treatment; Foster Mother also explained that Laura is continuing the medication to "evacuate properly" and that "it could take months, years" to resolve. She testified that suppositories were not recommended as medication and that more fiber in Laura's diet was needed, along with doctor-directed medication. Foster Mother testified that Laura has not been diagnosed with lactose intolerance, but that since she began her treatment, her medical issues have improved so she is now able to have bowel movements and can understand her body's signals. She testified that the diagnosis also deeply affected Laura because children had "made fun of her" for being smelly, being changed so frequently, and being unaware she soiled herself.

Foster Mother also observed a damaged tooth in Laura's mouth after Laura was in pain from eating. Foster Mother testified that she took Laura to the dentist within a week, who confirmed she had six cavities, and Laura had to have two molars "capped" because the nerves were exposed. She testified that Laura has not had problems eating since her dental issue was resolved.

Foster Mother testified the girls lacked certain basic skills when they arrived, explaining they did not know how to brush their teeth, use the toilet, clean themselves in the bath, or their "ABCs." She also stated that Mary was bonded to Laura and viewed Laura as a maternal figure, calling her "Mommy." Foster Mother testified, however, that the "biggest surprise" to her was the girls, and Laura in particular, were "expecting me to change their diapers." She testified that the children are now "thriving," have learned the skills they lacked when they were first placed with her.

Foster Mother testified that no visits occurred with Father, that Father did not reach out about visits, did not participate in any phone calls with the girls, and did not send gifts to the girls in the nine months they were placed with her. She stated that the Daughters have expressed they miss their family generally, but not specifically about Mother or Father; she testified that they have sometimes spoken about their older siblings. On cross-examination, Foster Mother explained that the distress experienced by Laura was "extreme" when she was first placed, with crying almost every day. She also testified that she did not have Father's contact information and she did not believe Father had hers, but she explained that usually after getting to know parents she will exchange numbers with them for additional communication, which did not happen here.

Foster Mother emphasized that "[i]n all my years, I've never seen abandonment by both parents" and that the girls are very attached to her. Foster Mother testified that her opinion was the children had been neglected based on "the amount of crying, the inability for basic care to do for themselves, [and] the infantizing of the interaction that I've seen." When asked whether Laura was in a health crisis when she was placed in the foster home, Foster Mother responded "absolutely."

23

Bechtel, the CASA volunteer for the Daughters, returned to the stand and testified that during her visits Father had properly dressed the children and his home was appropriate, but she also expressed concerns about the girls sharing a bed at Father's home and Laura's bathroom habits. She confirmed that Father did not take the girls to the doctor for their required visits, and she confirmed that Father had told them to "F off" and hung up during a call to discuss the family plan. She also confirmed she witnessed Father being aggressive towards Whiteley in front of the Daughters. She expressed concern about the girls' nutrition in Father's care, and she explained that since being removed they are "gaining weight" and "thriving." She explained that in the nine months since removal, the girls have improved medically, educationally, and nutritionally and seem happier. She confirmed Father had not visited the children after their removal, and she explained that Father only sent a video message to Mother for the Daughters, telling Mary happy birthday and telling the girls he loved them. Bechtel testified that Father had endangered the Daughters and that not returning them to Father was in their best interest because Father "is not able to provide medical and nutritional needs to his children." She testified that Father did not take responsibility for what happened and did not take "obvious" steps to assist the children with their medical needs, explaining that Father could have "taken them to the doctors." Bechtel testified that Father told her that he was potty training the children, but when she visited "there was never any attempts to take the girls to the bathroom," he never asked them "if they needed to go," and Father merely changed Laura's diaper on the couch.

Cousin, who is Father's nephew, testified that he lived with his grandparents when the Daughters were placed with them at the beginning of the case. He described Father's interaction with Daughters as always "pleasant" and that they had positive interactions with their siblings. Cousin testified that Father is a good cook, that he would cook for the girls when he

24

visited, and that the girls did not seem hungry. He testified that Father was attentive to the girls' needs and that his grandparents were potty training the girls. Cousin testified that he also did not observe the girls crying more than normal and had not observed Mary calling Laura "mommy." Cousin testified that "all [Father] talks about is that he wants to see his kids" and expressed doubt that Father had not asked to see the children since their removal. Cousin expressed surprise that Father had refused to take alcohol tests or that Father had refused to take the girls to doctor or dentist visits. Cousin explained that he had not seen the Daughters since they lived at his grandparents' home early the previous year and that he did not know what happened in Father's home when the girls lived with him "[o]ther than the times that I went and visited." Cousin confirmed he had visited Father's house about once a month, and he described it as "very organized, well kept, clean." He testified that when he visited, the girls were happy and as "well-mannered as a four-year-old and a one-year-old can be." Cousin confirmed he was aware Father had multiple DWI convictions and that Mother has alcohol and drug issues. Cousin then denied having seen Father drink in front of the children, drink excessively, or drink excessively before driving a vehicle.

Pete Ruth then testified that he has known Father for 27 years and that he "rarely, but on occasion" saw Father with his children remotely through "technological media" because he lived out of state. Ruth described Father as "fun-loving, kind, generous" and dependable. Ruth characterized Father as participating in "responsible drinking" but that he "would not characterize him as a drunk." Ruth described Father as an "unequivocally" good cook, and that he would think someone was "drunk or crazy" if they said Father did not feed his kids. On cross-examination, Ruth explained that he had not seen Father in person for over a decade and had not personally met Laura or Mary. Ruth was not aware that Father had three DWI

25

convictions in Texas, and when asked whether he would call Father a "responsible drinker" knowing that Father had several DWIs, Ruth responded, "Probably not." When asked about Father's refusal to visit the children since their removal, Ruth relayed that Father had expressed he could not afford "to have someone like a court-appointed person or whatever that he had to pay just to be there to supervise the visits."

Aunt, Father's sister, then testified that she lived out of state but visited the family twice a year and they communicated weekly either by phone or FaceTime. She stated that her last visit to Texas was around May 2022. She testified she saw the Daughters at Father's house, and that the girls "loved it there." She stated that the girls had a sibling bond with their two older siblings. When asked whether the kids claimed to be hungry, Aunt responded that "nothing like they weren't being fed, kind of hungry." She also testified that if the Daughters' diapers were soiled, then "they usually, you know, say something and then they'd get changed right away" and that they were "always getting checked on." She testified that she did not observe the children screaming because "they were upset" and that she did not observe Mary calling Laura "Mommy." When describing Father's interaction with the children, Aunt testified that "you couldn't ask for a more loving, devoted father" and that "he's a great dad and he spends all of his time focusing on the kids and teaching them things and playing and having fun." Aunt testified that she never saw the children crying during mealtime. She testified that Father was "very upset" about his children being taken from him, but that he was never aggressive or yelled at the children. She testified that Father was "an excellent cook," and that he was working on potty training with the Daughters.

On cross-examination, Aunt testified when she visited around May 2022 the Daughters "were much improved from the time I had seen them previously." Aunt testified that

she did not know Mary and Laura had tested positive for methamphetamines in April 2022 and that the information "shocked" her. She testified that Father has not visited the girls since they were removed because "he doesn't want the same thing happening that happened to their mother," which she described as the Department "watching her every moment with them."

Paternal Grandmother then testified that the girls and Father lived with her and her husband around February 2022 before Father got his own house in March. She testified that Father took care of the kids—bathing them, clothing them, feeding them, "everything"—and she helped. She testified that Father is "totally engaged, involved, fully there dad" and that he "loves those kids more than anything in the whole world." She testified that she never saw Mary refer to Laura as "mommy" or treat her as a mother figure. Grandmother testified that she and her husband would drop the children off at the daycare in the mornings and that they would feed them a snack in the mornings beforehand. She confirmed Mary suffered conjunctivitis while at daycare and that she was treated with medicated eyedrops. She also testified that Laura had an "enlarged bowel," would suffer constipation and "painful bowel movement," and that Father was treating this through diet. She explained that they delayed full medical evaluations of the Daughters because they were waiting for the "insurance cards" and vaccination records for the girls. Grandmother testified that they found a doctor that would take the insurance a few days before the children were removed. When asked whether she had told the Department they did not want to be a permanent placement, Grandmother testified that "I said I would do nothing to help CPS take my son's children away." When asked if her response would have been different had she understood the Department was seeking placement during the pending case, she responded "absolutely" and clarified that she only "objected to was [becoming] a legal guardian and tak[ing] the [Daughters] away" from Father.

On cross-examination, she confirmed that Father told her that "he had to get the kids in for a well check," but she was not aware of the deadlines for completing the medical evaluations. She testified that she was unaware that the insurance information had been provided to Father on two earlier occasions. She testified that they "finally got insurance cards" for both girls seven or ten days before they found the pediatrician and they "still had not received their vaccination records."

Father returned to the stand, and he testified that he has purchased a second bed so the girls could sleep in two separate beds. He denied the children had noticeably soiled clothing in his house, that he raised his voice at his children unless he needed their attention when "something immediately wrong is going to endanger them," or that Mary ever called Laura "mommy." He explained that six months before the case, he took Laura to the doctor for "constant constipation," that he was working on a consistent diet for her to resolve those issues, and that he tried to eliminate dairy and cheese from her diet but did not ever say she was "lactose intolerant." He described his plans if the Daughters were returned, and he emphasized that he did not have plans for Mother to be in the Daughters' lives.

After deliberations, the jury found that Father's parental rights should be terminated pursuant to subsections (D), (E), (N), and (O) statutory grounds and found termination as in the Daughters' best interest. The trial court thereafter signed a final order consistent with the jury's verdict. These appeals followed.

**STANDARD OF REVIEW**

To terminate the parent-child relationship, a court must find by clear and convincing evidence that (1) the parent has committed one of the enumerated statutory grounds

for termination and (2) it is in the child's best interest to terminate the parent's rights. Tex. Fam. Code § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

In this context, "[t]he distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). When evaluating legal sufficiency of the evidence, we consider whether "a reasonable factfinder could form a firm belief or conviction that the finding was true" when the evidence is viewed in the light most favorable to the factfinder's determination and undisputed contrary evidence is considered. *Id.* at 631. When evaluating factual sufficiency of the evidence, we consider whether "in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* We must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *see also In re P.A.C.*, 498 S.W.3d 210, 214 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

However, "an appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "While parental rights are of constitutional magnitude, they are not absolute." *Id.* "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id.*

**DISCUSSION**

On appeal, Mother challenges the legal and factual sufficiency of the evidence supporting that termination of her parental rights was in the best interest of Laura, Mary, and Kevin. Father challenges the legal and factual sufficiency of the evidence supporting the jury's finding that termination of his parental rights as to Laura and Mary is warranted under subsections (D), (E), (N), and (O) of Section 161.001 of the Texas Family Code; the legal and factual sufficiency of the evidence supporting the finding that termination was in Laura's or Mary's best interest, and the sufficiency of the evidence rebutting the presumption that he should be appointed conservator of the Daughters.

### Best Interest Finding as to Mother

"[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). "In parental-termination proceedings, [the Department's] burden is not simply to prove that a parent should not have custody of [the] child; [the Department] must meet the heightened burden to prove, by clear and convincing evidence, that the parent should no longer have any relationship with the child whatsoever." *S.B. v. Texas Dep't of Fam. & Protective Servs.*, 654 S.W.3d 246, 255 (Tex. App.—Austin 2022, pet. denied) (quoting *In re D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.)).

We may consider several factors to determine whether termination is in a child's best interest, including: the child's wishes, the child's emotional and physical needs now and in the future, any emotional or physical danger to the child now and in the future, the parenting abilities of any parties seeking access to the child, programs available to help those parties, plans

for the child, the stability of any proposed placement, any evidence that the parent-child relationship is improper, and any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also In re A.C.*, 560 S.W.3d at 631; *S.B.*, 654 S.W.3d at 255. The party seeking termination has the burden of establishing that termination is in the child's best interest. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). The set of factors is not exhaustive; although one factor is not necessarily dispositive, in some instances evidence of a single factor may suffice to support the best interest finding. *See Holley*, 544 S.W.2d at 371–72; se*e also In re C.H.*, 89 S.W.3d at 27; *S.B.*, 654 S.W.3d at 255. Ultimately, the *Holley* factors focus on the child's best interest, not the parent's. *In re C.L.C.*, 119 S.W.3d 382, 399 (Tex. App.—Tyler 2003, no pet.). Evidence proving one or more statutory grounds for termination can be probative evidence that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d at 28.

As for the Children's wishes, there was some testimony that the Daughters "miss their family" and "talk about their parents living with [Foster Mother], living here together." Other testimony indicated that Mary had not expressed any specific desire, and Laura did not say she "wants to live with her mom or her dad" but indicated she would like to see her older siblings. Kevin indicated that he "wants to see his mom."

Relevant to the Childrens' emotional and physical needs and any emotional or physical risks now and in the future, this case began after police discovered methamphetamine and paraphernalia in Mother's vehicle during a traffic stop. *See A.W. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00324-CV, 2021 WL 5911975, at *6 (Tex. App.—Austin Dec. 15, 2021, no pet.) (mem. op.) (explaining factfinder could infer as part of best interest determination that evidence of past endangering conduct was probative of future conduct). Mother denied she used methamphetamines and provided various conflicting reasons for her circumstances and

positive drug tests, including the drugs belonged to her oldest daughter, that she was only visiting the "trap house" because "a friend was paying her $50 to pick up methamphetamine," and that she had been buying her prescription medication "off the street" and that medication was unknowingly filled with methamphetamine. *See E.F.-B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00443-CV, 2022 WL 17478423, at *4 (Tex. App.—Austin Dec. 7, 2022, no pet.) (mem. op.) ("[A] trial court is not bound to accept the truth or accuracy of a parent's testimony, either as to past actions or future intentions." (quoting *In re D.M.*, 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.)). All three Children then tested positive for methamphetamine, and Mother blamed her boyfriend who "would do meth in the house" and claimed she kicked him out as soon as she learned he was using. *See In re A.B.*, 437 S.W.3d at 503 (recognizing that factfinder had "full opportunity to observe witness testimony first-hand" and assess "the credibility and demeanor of witnesses"). But then Mother continued to communicate with him afterwards, even when he was incarcerated.

Nor was Mother's issues with drugs and stability limited only to the time period before the children's removal. "[S]tability and permanence are paramount considerations in evaluating the needs of a child." *N.K. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00028-CV, 2022 WL 2673236, at *8 (Tex. App.—Austin July 12, 2022, no pet.) (mem. op.). Mother continued to test positive during the case, refused to attend half of her required drug testing, showed up late to several visitations, and failed to attend a third of her scheduled visitation. *See A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 706 (Tex. App.—Austin 2019, pet. denied) (explaining that factfinder could reasonably infer from parent's failure to complete required services and failure to visit child "on a consistent, regular basis" that parent was "not ready, willing, or able to be a parent to the child"). Moreover, this was Mother's

32

fourth case with the Department, the children had been previously removed, and Mother had purportedly changed her behavior and gotten sober since the last removal. The trial court could reasonably infer from such evidence that her "lack of effort to resolve the issues [leads] to the conclusion that if the children stayed in her care, they would continue to be exposed to these behaviors." *In re G.Z.*, No. 02-21-00122-CV, 2021 WL 3796049, at *9 (Tex. App.—Fort Worth Aug. 26, 2021, no pet.) (mem. op.).

Finally, as to parenting ability, available programs, and the plans for the children, the trial court heard testimony that Mother had not taken adequate steps to ensure Laura received proper care for her medical issues and that Mother knew Laura had a cracked tooth but that she "didn't see that it was that bad at all." Mother also testified that she was employed and had a home suitable for the Children. But when pressed, Mother conceded that she would not be able to keep her current job, that she did not have a driver's license but would "find a way" to transport the Children when needed, that her current lease would end soon, and that she would be able to afford rent only because she assumed she would receive child support if the children were returned. At the end of the hearing, the trial court expressly admonished that it did not find Mother's testimony "likely to be truthful at all." *See In re A.B.*, 437 S.W.3d at 503; *see also C.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00351-CV, 2020 WL 6811997, at *3 (Tex. App.—Austin Nov. 20, 2020, no pet.) (mem. op.) (explaining factfinder could have reasonably decided that parent's testimony was not credible). In contrast, the Department presented testimony that Kevin was placed with his maternal grandmother and doing well, and that the Daughters were placed in a foster home that, while not a foster-to-adopt placement, would remain willing to be a long-term foster placement and "would continue to look after them and of course advocate for whatever is best for them."

33

Taken together, we conclude that the trial court could have reasonably believed that termination of Mother's parental rights was in the Children's best interest. *See In re C.H.*, 89 S.W.3d at 27. Moreover, there is not any disputed evidence that is so significant as to prevent the trial court from forming that firm conviction. *In re A.C.*, 560 S.W.3d at 630. We conclude that the evidence is legally and factually sufficient to support the trial court's finding that termination of Mother parental rights was in the best interest of the Children. We overrule Mother's sole issue on appeal.

### *Best Interest Finding as to Father*

In Father's fifth issue on appeal, he challenges the legal and factual sufficiency of the evidence supporting the jury's finding that termination was in the best interest of Laura and Mary. *See Holley*, 544 S.W.2d at 371–72; se*e also In re C.H.*, 89 S.W.3d at 27.[7]

Beginning with the Daughters' wishes, there was no testimony that either girl adequately expressed her desires beyond testimony that the girls had expressed some feelings of missing their family generally (but without any specific reference to Mother or Father). However, there was also testimony that the Daughters were happy in the foster home, doing well and developing appropriately, and bonded with Foster Mother. *See S.L. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00722-CV, 2023 WL 3512412, at *7 (Tex. App.—Austin May 18, 2023, no pet.) (mem. op.) (considering evidence that child was bonded with and loved by foster family when too young to express wishes). Father also failed to pursue any visitation of the girls for nine months following removal (except for a single video message). *See N.K.*,

---

[7] The analysis of Father's best interest finding differs from the analysis of Mother's because the evidence presented at Father's jury trial differed at times from the evidence presented at Mother's bench trial (even though the same legal standard applies).

2022 WL 2673236, at *7 (explaining fact finder "could have inferred that the long absence would render it less likely that the girls would want to maintain a relationship with a Father").

Considering the Daughters' emotional and physical needs and any emotional or physical risks now and in the future, "it is well settled that stability and permanence are paramount considerations in evaluating the needs of a child." *Id.* at *8. The jury heard testimony about Father's endangering conduct in failing to take Laura to necessary medical and dental evaluations while the Daughters were placed with him and the subsequent medical and dental treatment required for Laura after placement with Foster Mother. *See A.W.*, 2021 WL 5911975, at *6 (considering evidence of past endangering conduct as probative of future conduct). Although there was conflicting testimony about Father's ability to feed and meet the nutritional needs of the Daughters while in his care, testimony concerning Father's actions (and inactions) after Daughters' removal was undisputed. Father did not attempt to visit his children for the nine months following removal; refused to cooperate with the Department, participate in services, or respond to the caseworker about visitations; and failed to maintain a relationship with the Daughters besides a single video message for nine months. *See A.C.*, 577 S.W.3d at 706 (explaining that parent's failure to complete required services and failure to visit child showed that parent was "not ready, willing, or able to be a parent to the child").

Finally, as to parenting ability, available programs, the plans for the children, and excuses for a parent's conduct, there was testimony that Father was a loving parent who was invested in and involved in raising Daughters; that Father had experience raising children, including his two older children; that Father had a well-kept and clean home with beds for Daughters; and that Father had stable income. However, Father also extensively testified that he did not believe he "should have to work any services," that he was willing to do anything for his

35

children but refused to "participate in services in order for them to be returned to [him] as the sole managing conservator," and that Father failed to schedule any visitation with Daughters after their removal. *See id.* And when Father was asked whether what "you have failed to do is [not] your fault, but it's the Department's fault" instead, Father responded, "Absolutely." *See In re M.A.C.*, No. 05-22-01262-CV, 2023 WL 3267867, at *10 (Tex. App.—Dallas May 5, 2023, pet. denied) (mem. op.) (concluding parent's failure to complete services and "failure to take responsibility for [their] actions" supported best interest finding). Furthermore, there was also testimony that Daughters were currently placed in a safe and thriving temporary foster placement and that the Department was pursuing a permanent placement for them.

Reviewing the record under the appropriate standards of review, considering the relevant factors, and understanding that the jury had the "full opportunity to observe witness testimony first-hand" to assess credibility and demeanor of the witnesses, *In re A.B.*, 437 S.W.3d at 503, we conclude that the jury could have reasonably believed that termination of Father's parental rights was in the Daughters' best interest. *See In re C.H.*, 89 S.W.3d at 27. Moreover, there is not any disputed evidence that is so significant as to prevent the jury from forming that firm conviction. *See In re A.C.*, 560 S.W.3d at 630. We conclude that the evidence is legally and factually sufficient to support the jury's finding that termination of Father's parental rights was in the best interest of the Daughters. We overrule Father's fifth issue.

***Predicate Statutory Grounds as to Father***

In his first, second, third, and fourth issues, Father challenges the legal and factual sufficiency of the evidence supporting termination of his parental rights under subsections (D), (E), (N), and (O) of Section 161.001 of the Texas Family Code. *See* Tex. Fam. Code § 161.001(b)(1)(D) (endangering environment), (E) (endangering conduct), (N) (constructive abandonment), (O) (failure to comply with court order). We begin our analysis with the subsection (D) and (E) findings. *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam).

Subsection (D) "focuses on the child's environment and may be utilized as a ground for termination when the parent has 'knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child.'" *In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022) (quoting Tex. Fam. Code § 161.001(b)(1)(D)). Subsection (E) focuses on a parent's conduct and "allows for termination of parental rights if clear and convincing evidence supports that the parent 'engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.'" *In re N.G.*, 577 S.W.3d at 234 (quoting Tex. Fam. Code § 161.001(b)(1)(E)).

The relevant inquiry under Subsection (D) is whether "the child's environment, including the child's living conditions and conduct by parents or others in the home, endangered the child's well-being." *J.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00274-CV, 2021 WL 5225432, at *5 (Tex. App.—Austin Nov. 10, 2021, pet. denied) (mem. op.). "A child is endangered when the environment creates a potential for danger and the parent is aware of the danger but consciously disregards it." *In re J.E.M.M.*, 532 S.W.3d 874, 881 (Tex. App.—Houston [14th Dist.] 2017, no pet.). "A single act or omission can support termination under

37

subsection (D)." *J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.). In contrast, the relevant inquiry under Subsection (E) is whether evidence exists that the endangerment of the child's well-being "was the direct result of Appellant's conduct, including acts, omissions, or failures to act," *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied), and "must be based on more than a single act or omission," *C.B. v. Texas Dep't of Fam. & Protective Servs.*, 458 S.W.3d 576, 582 (Tex. App.—El Paso 2014, pet. denied).

For both the child's environment under Subsection (D) and the parent's conduct under Subsection (E), "endanger" means "to expose to loss or injury; to jeopardize." *In re J.W.*, 645 S.W.3d at 748 (quoting *Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "'[E]ndanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, [but] it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (quoting *Boyd*, 727 S.W.2d at 533); *see also A.C.*, 577 S.W.3d at 699. Thus, "conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *J.G.*, 592 S.W.3d at 524 (quoting *In re J.O.A.*, 283 S.W.3d 336, 345 n.4 (Tex. 2009)). "Because the evidence pertaining to subsections (D) and (E) is interrelated, we consolidate our review of the evidence." *J.M.*, 2021 WL 5225432, at *5.

At trial, the jury heard extensive testimony concerning Father's actions (and inactions) before the Department's case initiated, during the placement of Laura and Mary with Father, and after the girls were removed and placed with Foster Mother. Exhibits and testimony showed Father had four DWI convictions, the most recent of which was in 2021, and that Father had an ignition interlock device installed in his vehicle as part of his probation. *See E.A.H.*

38

*v. Texas Dep't of Fam. & Protective Servs.*, No. 03-17-00816-CV, 2018 WL 2451824, at *4 (Tex. App.—Austin June 1, 2018, no pet.) (mem. op.) (explaining evidence of parent's history of alcohol abuse and related criminal convictions supported endangerment finding); *In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.) (explaining evidence of alcohol abuse by parent may support finding parent's conduct endangered child). Father testified that he did not drink around his children, but endangering conduct "may include the parent's actions before the child[ren's] birth[s]" and may include use outside the child's immediate presence. *See In re J.O.A.*, 283 S.W.3d at 345–46 (concluding sufficient evidence supported that father endangered children based in part on evidence of father's drug usage before birth of removed children and outside presence of his older child). Similarly, Father testified that he had not drank alcohol for the approximately two years since his previous DWI conviction, but such "a recent turn-around in behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past." *N.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00217-CV, 2019 WL 3952842, at *8 (Tex. App.—Austin Aug. 22, 2019, no pet.) (mem. op.) (quoting *Smith v. Texas Dep't of Protective & Regul. Servs.*, 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.)).

Then when the girls were placed with Father from April 12, 2022, through June 23, 2022, the jury heard testimony that Father failed to take Laura or Mary to their required medical evaluations or to any dental visits. *See In re J.H.*, No. 01-22-00629-CV, 2023 WL 2169952, at *14 (Tex. App.—Houston [1st Dist.] Feb. 23, 2023, pet. denied) (mem. op.) ("[A] parent's neglect of [his] child's medical or dental needs endangers the child."). Father's and Grandmother's testimony confirmed that neither daughter attended any of the medical evaluations within the deadline required as part of placement with Father. *See D.H.*

*v. Texas Dep't of Fam. & Protective Servs.*, 652 S.W.3d 54, 60 (Tex. App.—Austin 2021, no pet.) ("The failure to provide or obtain appropriate medical care for a child can constitute endangering conduct under subsection (E)."). Father and Grandmother testified that the Department did not timely provide insurance information necessary for scheduling those medical evaluations, but other testimony showed that Father was provided all the necessary information for making the appointments on the day the Daughters were placed with Father (and again several weeks later). *See In re A.B.*, 437 S.W.3d at 503 (explaining that factfinder "is the sole arbiter when assessing the credibility and demeanor of witnesses"). Within two weeks of the children being removed from Father's home, Foster Mother testified that Laura was taken both for a medical evaluation—where she received her formal diagnoses and treatment—and for an emergent dental exam to treat her cavities and exposed nerve on her molars. *See In re A.M.*, No. 07-18-00141-CV, 2018 WL 3799885, at *10 (Tex. App.—Amarillo Aug. 9, 2018, no pet.) (mem. op.) (neglecting medical and dental needs endangers child's physical well-being "even if the parent did not cause the condition that requires medical treatment"). Although the jury heard conflicting testimony about whether Father may have taken Laura for a medical evaluation prior to the Department's case and the efficacy of Father's efforts to treat Laura's medical condition through dairy elimination and diet, the testimony was undisputed that Father failed to take either daughter to their required medical evaluations while placed with Father; the only testimony regarding a medical evaluation received by the girls during those two months concerned Mary's emergency treatment of conjunctivitis. Foster Mother also provided testimony that the girls were underweight when they were initially placed in her home, and that Laura's eating habits and weight improved after treatment of her dental symptoms. *See T.A.W. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00364-CV, 2021 WL 81866, at *4 (Tex. App.—Austin Jan. 8,

2021, pet. denied) (mem. op.) (concluding that evidence of neglect of necessary medical and dental care and concerns about children "not having enough food" supported finding under subsection (D)); *In re T.B.*, No. 09-20-00172-CV, 2020 WL 6787523, at *7 (Tex. App.—Beaumont Nov. 19, 2020, no pet.) (mem. op.) ("Neglect of a child's medical needs, including failure to thrive resulting from nutritional neglect, endangers a child.").

After the girls were removed and placed with Foster Mother, the jury heard testimony that Father failed to participate in or schedule any visitation with the Daughters for nine months. *See In re J.A.V.*, 632 S.W.3d 121, 132 (Tex. App.—El Paso 2021, no pet.) ("Finally, a parent's inconsistent visitation may also be considered as part of the endangerment analysis, as can the parent's failure to participate in a service plan."); *D.L.G. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00314-CV, 2020 WL 6789208, at *5 (Tex. App.—Austin Nov. 19, 2020, no pet.) (mem. op.) (explaining missed visitations, lack of contact with child, and failure to complete service plan support endangerment finding). Although there was testimony that Father sent a single video message to other family members to be shared with Daughters, Father otherwise refused to maintain or seek contact with the Daughters while they were placed with Foster Mother. *See In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (characterizing parent's absence as creating an "emotional vacuum" endangering child's well-being), *overruled on other grounds by In re L.C.L.*, 599 S.W.3d 79, 82 (Tex. App.—Houston [14th Dist.] 2020, no pet.).

We conclude that this evidence is legally and factually sufficient to support the jury's finding that Father knowingly placed or knowingly allowed Laura and Mary to remain in conditions and surroundings which endangered their physical or emotional well-being and its finding that Father engaged in conduct or knowingly placed Laura and Mary with persons who

41

engaged in conduct which endangered their physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D)–(E); *In re J.W.*, 645 S.W.3d at 749.[8]

We overrule Father's first, second, third, and fourth issues.

### *Conservatorship as to Father*

In his final issue, Father argues that the trial court abused its discretion by appointing the Department as permanent managing conservator. *See* Tex. Fam. Code § 153.131(b). Because Father's parental rights have been terminated and we are affirming the district court order terminating his parental rights, Father lacks standing to challenge the district court's conservatorship decision. *See* Tex. Fam. Code § 161.206(b); *see also R.G. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-23-00042-CV, 2023 WL 4239802, at *9 (Tex. App.—Austin June 29, 2023, no pet. h.) (mem. op.); *A.K. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00285-CV, 2022 WL 14989625, at *10 (Tex. App.—Austin Oct. 27, 2022, pet. denied) (mem. op.).

Moreover, Section 153.131(b) is inapplicable here because it only creates "a statutory preference for placement with a parent while a parent still retains [his] parental rights." *T.J. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-14-00351-CV, 2014 WL 6845198, at *5 (Tex. App.—Austin Nov. 25, 2014, no pet.) (mem. op.). Father, however, no longer enjoys any conservatorship presumption after his parental rights have been terminated. *See* Tex. Fam. Code

---

[8] Because there is sufficient evidence supporting the jury's finding under subsection (D) and (E), we need not address Father's challenges to the other predicate statutory grounds challenged on appeal. *See In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam) (explaining that appellate court may affirm termination judgment by upholding best interest and one termination ground under section 161.001(b)(1)); *see also E.F.-B. v. Texas Dep't of Family & Protective Servs.*, No. 03-22-00443-CV, 2022 WL 17478423, at *3 (Tex. App.—Austin Dec. 7, 2022, no pet.) (mem. op.) (same).

§ 101.024(a) (noting that, for purposes of Family Code, "the term [parent] does not include a parent as to whom the parent-child relationship has been terminated"). Father has failed to demonstrate his entitlement to appointment as managing conservator under Section 153.131. *See In re M.S.*, No. 02-21-00007-CV, 2021 WL 2654143, at *21 (Tex. App.—Fort Worth June 28, 2021, pet. denied) (mem. op.) (concluding no abuse of discretion in appointing Department managing conservator after termination of parent's parental rights). We overrule his final issue.

## CONCLUSION

Having concluded there was sufficient evidence supporting the trial court's best interest finding as to Mother, and the jury's best interest finding and its findings under subsections (D) and (E) as to Father, we affirm the trial court's decrees terminating Mother's parental rights to the Children and Father's parental rights to the Daughters.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Kelly and Theofanis

Affirmed

Filed: September 22, 2023

43